IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 21, 2016

**STATE OF TENNESSEE v. TYRONE BATTS**

**Appeal from the Criminal Court for Davidson County**
**No. 2012-B-1185        J. Randall Wyatt, Jr., Judge**

———————————

**No. M2015-01662-CCA-R3-CD – Filed March 27, 2017**

———————————

A Davidson County Criminal Court Jury convicted the Appellant, Tyrone Batts, of two counts of rape, a Class B felony; one count of attempted rape, a Class C felony; and one count of robbery, a Class C felony. After a sentencing hearing, the Appellant received an effective thirty-six-year sentence. On appeal, the Appellant contends that the evidence is insufficient to support his robbery conviction, that the trial court erred by allowing a nurse practitioner to testify about statements made by the victim, that the trial court erred by allowing the prosecutor to make improper comments during the State's closing arguments, that his separate convictions for rape and attempted rape violate due process and double jeopardy, and that the trial court erred by imposing the maximum punishment in the range for each offense and consecutive sentencing. Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and TIMOTHY L. EASTER, JJ., joined.

Jeffrey A. DeVasher and Emma Rae Tennent (on appeal) and Martesha L. Johnson and Jonathan Wing (at trial), Nashville, Tennessee, for the appellant, Tyrone Batts.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Glenn R. Funk, District Attorney General; and Amy M. Hunter and Mindy Morris, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In May 2012, the Davidson County Grand Jury indicted the Appellant for two counts of rape, one count of attempted rape, and one count of robbery. Subsequently, the trial court ordered that he have a psychiatric evaluation at Middle Tennessee Mental Health Institute (MTMHI) to determine his mental competency. On March 31, 2015, the trial court found the Appellant competent to stand trial, and he proceeded to trial on April 6, 2015.

The victim testified that in February 2012, she was a student at Vanderbilt University. On the night of Friday, February 10, the victim was planning to meet some friends for a concert. She said that she walked to the on-campus parking garage where she always parked her car and that "plenty" of cars were in the garage. When the victim got to her car, she opened the door and perceived someone immediately behind her. She said that she knew something was wrong and that she was terrified.

The victim testified that she turned around and that a man, whom she later identified as the Appellant, pushed her into her car. He unfastened his pants and "forced [her] head onto him." The victim was gagging and "trying to reason" with him, but he kept forcing her mouth onto his penis. She said that the Appellant told her to "'suck his [d***]'" and that his penis went into her mouth. After a couple of minutes, the Appellant "pushed [her] down," lifted her dress, and "went down on [her]." She stated that he put his lips and tongue on and inside her vagina. The State asked if she was afraid, and the victim responded, "Yes. . . . I didn't know what he had, if he had like a gun or knife or anything and I didn't want to find out, so I just again did what I needed, what I felt like I needed to do just to survive." She said that she kept "trying to talk him out of it" and that she was "hoping that he would just stop." About one minute later, the Appellant stopped putting his mouth on her and tried to penetrate her vagina with his penis but was unable to do so. The victim explained that the Appellant was nervous and "kept looking around because at any moment, really, someone could have driven by or walked up."

The victim testified that after the Appellant was unable to penetrate her, he "pulled [her] back up and told her to "'keep sucking his [d***].'" She acknowledged that the Appellant was holding the back of her head and pushing his penis into her mouth. He continued to do so until he ejaculated onto her chest, face, and eye. The Appellant then asked the victim if she had any money. The victim was in shock, scared, and "just wanted him to go." She said she was still terrified and gave him the money from her purse. The Appellant left, and the victim shut and locked her car door. She telephoned the police and drove to a nearby Mexican restaurant.

The victim testified that the incident occurred about 7:00 p.m. and lasted ten minutes or less. Her car door was open, and the Appellant had an erection the entire time. It was dark outside, but the lights in the parking garage were on and the area was

bright. An ambulance arrived at the Mexican restaurant and transported the victim to the hospital. She spoke to a police officer, and a nurse practitioner collected evidence for a rape kit. A couple of days later, a detective showed the victim a photograph array, and she selected the Appellant's photograph. She said she had never seen or spoken to the Appellant prior to February 10, 2012.

On cross-examination, the victim acknowledged that she viewed the photograph array at the police department on February 13. She also acknowledged that prior to viewing the array, she had been told that the police had a suspect. After she selected the Appellant's photograph, the police confirmed that he was the suspect. On redirect examination, the victim testified that she was 100% certain the Appellant was her attacker.

Officer Dustin Chester of the Metropolitan Nashville Police Department (MNPD) testified that on February 10, 2012, he was dispatched to the Qdoba Grill for a "rape call." Officer Chester was "just around the corner" from the restaurant, which was directly in front of the Terrace Parking Garage, and arrived almost immediately. Less than one minute later, the victim's car pulled up. Officer Chester said that the victim was very distraught, that she was crying profusely, and that "you could tell that she had just been [through] something that . . . obviously scared her." A white liquid that appeared to be semen was on the victim's face.

On cross-examination, Officer Chester testified that the victim described her attacker as an African-American male, twenty to thirty years old, six feet tall, and weighing 200 pounds. She said he was wearing a black shirt and blue jeans.

On redirect examination, Officer Chester testified that the victim told him that the man "made her perform oral sex on him and then pushed her further into the car where he lifted her dress and performed oral sex on her." She did not think the Appellant's genitals penetrated her genitals. The victim said that "at the end" of the attack, the man told her to give him all of her money. She gave him $23.

Sergeant Ryan Finnegan of the MNPD testified that he heard about the incident over the police radio and was responsible for securing the parking garage. He used his police car to block one of the exits, and he and other officers cleared the stairwells and each level of the garage. He said that the lighting in the garage was good and that he had to use his flashlight only to look into individual vehicles. The police did not locate a suspect that day.

Pamela Crues testified by video deposition that she was a nurse practitioner in the emergency room at Nashville General Hospital. On the night of February 10, 2012, Ms.

Crues interviewed the victim at the hospital. The victim told Ms. Crues that her assailant forced her to "perform oral sex" on him, that he "performed oral sex" on her, that he attempted to have vaginal sex with her, and that he ejaculated onto her face. Based on what the victim told her, Ms. Crues collected swabs from the victim's oral gum line, labia, vagina, face, left eye, and neck. She placed the sealed swabs in a rape kit and sealed the kit.

Sergeant Michelle Hammond of the MNPD testified that in February 2012, she was a detective in the Sex Crimes Unit. On February 10, she responded to Nashville General Hospital and spoke with the victim. She said that the victim was "visibly shaken" and that the victim's hair, makeup, and clothing were disheveled. The victim also had a crusty substance on her face, and Sergeant Hammond told the victim to keep her hands away from her face in order to preserve the evidence.

Sergeant Hammond testified that the victim described her attacker as an African-American male, "in his 20s," having a shaven head, and weighing 180 to 200 pounds. The victim told the officer that the man "immediately grabbed her by the hair and said, 'suck my [d***]' and forced her to perform oral sex on him." The victim said she tried to reason with him. He told her that he was not going to hurt her, but he "forcefully laid her back to where she was in, partially in her chair over the console and then performed oral sex on her." Afterward, he got on top of her and attempted to vaginally penetrate her with his penis. He was unable to do so, so he got off of her and told her to give him oral sex again. He intermittently masturbated and ejaculated partially in her mouth and on her face.

Sergeant Hammond testified that the victim said the man asked if she had any money. Sergeant Hammond stated, "At that point she took it, you know, fearful for her life she took it out of her wallet and [gave] him $23." He asked if that was all the money she had, and the victim told him yes. The man then walked away.

On cross-examination, Sergeant Hammond acknowledged that three days later, she showed a six-photograph array to the victim. At that time, Sergeant Hammond knew the Appellant was a suspect. On redirect examination, Sergeant Hammond acknowledged that she did not say anything to the victim to suggest the Appellant was the suspect.

Heather Baltz testified that she was a detective in the MNPD's Sex Crimes Unit in February 2012 and the lead detective in this case. On February 12, she asked the Appellant if he would provide a DNA sample. He agreed, so Ms. Baltz collected a cheek swab from him. On cross-examination, Ms. Baltz acknowledged that prior to showing

the victim the photograph array on February 13, she contacted the victim and advised her that a suspect was in custody.

Chad Johnson, a special agent forensic scientist with the Tennessee Bureau of Investigation, testified as an expert in DNA analysis that he analyzed evidence collected in this case. A labial swab collected from the victim revealed the presence of Amylase, a chemical found in saliva. However, only the victim's DNA profile was obtained from the sample. An oral gum-line swab collected from the victim was negative for the presence of semen or sperm. Neck and face swabs collected from the victim showed the presence of semen. Agent Johnson separated the semen into two components: A sperm component and a non-sperm component. The sperm DNA matched the Appellant's DNA. The non-sperm component showed that the Appellant was a major contributor to the mixture and that the victim was a minor contributor.

At the conclusion of Agent Johnson's testimony, the State rested its case and presented the following election of offenses: Count one, rape, for the Appellant's forcing the victim to perform fellatio on him immediately after he was behind her; count two, rape, for the Appellant's performing cunnilingus on the victim; and count three, attempted rape, for the Appellant's attempting to penetrate the victim's vagina with his penis. The jury convicted him of all three offenses and count four, robbery. After a sentencing hearing, the trial court sentenced him to an effective thirty-six years in confinement.

## II. Analysis

### A. Sufficiency of the Evidence

The Appellant contends that the evidence is insufficient to support his robbery conviction because it fails to show that he took the victim's property by violence or putting her in fear. In support of his argument, he notes that the State did not present any evidence that he was armed with a weapon, that he suggested to the victim that he possessed a weapon, that he threatened to harm her if she did not give him money, or that he forcibly took her purse. He argues that the evidence shows the victim gave him the money in order to stop the sexual assault, not because she was in fear of bodily injury. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest

legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103.

In support of his argument that the evidence is insufficient, the Appellant relies on State v. Owens, 20 S.W.3d 634, 636 (Tenn. 2000), in which the defendant took an item from a store without paying for it and fled. He ran for five blocks, stopped, and used a box cutter to confront an employee who had chased him. Id. In the case, our supreme court adopted the common law rule of robbery, stating that "the use of violence or fear must precede or be contemporaneous with the taking of property from the person." Id. at 641. The court went on to conclude that the evidence was insufficient to support the defendant's robbery conviction because the evidence did not show that the violence or fear preceded or was contemporaneous with the taking of the property from the store. Id.

The facts in the instant case are completely distinguishable from the facts in Owens. Taken in the light most favorable to the State, the evidence shows that the

Appellant approached the victim as she was getting into her car and forced her into her car. He made her perform oral sex on him, performed oral sex on her, and tried to penetrate her vaginally. He forced her to perform oral sex on him a second time and ejaculated onto her face and neck. At that point, he asked if she had any money, and she gave him the $23 she had in her purse. The victim repeatedly testified that she was terrified and in fear for her life during her ordeal and justifiably so: the Appellant had just raped her at least twice and had tried to rape her a third time. The State asked if the victim was afraid during the attack, and the victim responded, "Yes. I didn't know what he had, if he had like a gun or knife or anything and I didn't want to find out, so I just again did what I needed, what I felt like I needed to do just to survive." For this court to conclude that the victim did not fear the Appellant at the time of the robbery, which occurred immediately after the sexual offenses, because he did not use a weapon, suggest to her that he had a weapon, or threaten to harm her would be illogical. As the State argues in its brief, "[T]he victim's fear did not end when the defendant stopped raping her." We conclude that the evidence is more than sufficient to support the Appellant's robbery conviction.

## B. Hearsay

The Appellant claims that the trial court erred by allowing Pamela Crues to testify about statements made by the victim and by allowing the State to introduce Ms. Crues's report, which contained the victim's statements, into evidence. He contends that the evidence was hearsay and was not admissible pursuant to Tennessee Rule of Evidence 803(4), the hearsay exception for statements made for the purpose of medical diagnosis and treatment, because Ms. Crues obtained the victim's statements primarily for use in a criminal prosecution. The State argues that the evidence was admissible under the hearsay exception. We agree with the State.

During direct examination, Ms. Crues began to testify about statements made by the victim. Defense counsel objected on the grounds that Ms. Crues's testimony was hearsay, and the trial court overruled the objection. At the conclusion of her testimony, the State moved to introduce her report into evidence. Defense counsel again objected, and the State responded that the report was admissible pursuant to Tennessee Rule of Evidence 803(4). The trial court agreed with the State.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible during a trial, unless the statement falls under one of the exceptions to the rule against hearsay. See Tenn. R. Evid. 802. The victim's statements to Ms. Crues and included in Ms.

Crues's report were hearsay. Therefore, absent a relevant hearsay exception, the statements were inadmissible.

Rule 803(4), Tennessee Rules of Evidence, provides an exception to the hearsay rule for "[statements] made for purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." The Advisory Commission Comments for Rule 803(4) clarify that such statements "must be for both diagnosis and treatment." Our supreme court has explained that "if physicians or other medical personnel rely upon the statement in diagnosing and treating the patient, then the statement should be sufficiently trustworthy to be admissible in a court of law." State v. McLeod, 937 S.W.2d 867, 870 (Tenn. 1996).

A trial court's factual findings and credibility determinations regarding hearsay are binding upon this court unless the evidence preponderates against them. Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015). However, the determination of whether the statement in question is hearsay and whether a hearsay exception applies are questions of law that we review de novo. Id.

In arguing that the evidence was inadmissible under the hearsay exception because Ms. Crues obtained the victim's statements primarily for use in a criminal prosecution, not medical diagnosis and treatment, the Appellant relies on State v. Cannon, 254 S.W.3d 287 (Tenn. 2008). In Cannon, the defendant argued that the admission of the rape victim's statements into evidence through emergency room (ER) medical personnel and a nurse violated his right of confrontation because the victim, while available, did not testify at trial. Our supreme court held that "statements in medical records given for the primary purpose of medical diagnosis and treatment are nontestimonial" and, therefore, governed by the rules of evidence. 254 S.W.3d at 303. However, statements made primarily for the purpose of "'establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution'" are testimonial and, therefore, generally inadmissible. Id. at 305 (quoting Davis v. Washington, 547 U.S. 813, 822 (2006)). The court concluded that the victim's statements to the nurse, made after the victim spoke with and sought medical diagnosis and treatment from ER personnel, were testimonial and inadmissible because the defendant had no prior opportunity to cross-examine the victim. Id. at 305-06. Therefore, the court did not need to address the issue of whether the nurse's testimony was admissible under Tennessee Rule of Evidence 803(4).

Unlike Cannon, there is no confrontation problem in this case because the victim testified. Thus, we do not need to consider whether her statements to Ms. Crues were testimonial or non-testimonial and move directly to the admissibility of the evidence under Rule 803(4).

Ms. Crues testified that she was a board certified nurse practitioner and that she conducted sexual assault exams in the ER at Nashville General Hospital. She stated that she had "advanced training in women's health" and that she also had received training from the "Metro Crime Lab." She explained that during a patient's examination, she collected "legal evidence" and "treat[ed] the patient medically, . . . addressing any kind of medical concerns that would happen during the assault." She said she began a patient's examination by obtaining the patient's health history and then talking with the patient about what happened during the assault, which allowed her to decide which areas she needed to swab in order to collect DNA evidence. She stated that "once we collect the evidence we also treat the patient prophylactically for STDs, HIV, plan B, those type of things."

Ms. Crues testified that she interviewed the victim and that the victim said she had been forced to perform oral sex on the Appellant, that he had performed oral sex on her, and that he had tried to penetrate her vaginally. Based on the victim's statements, Ms. Crues swabbed the victim's gum line, labia, vagina, face, and neck. According to Ms. Crues's report, she did not see any signs of physical trauma on the victim, she did not examine the victim's genitalia, and she did not perform a pelvic examination. In the report, Ms. Crues wrote that the victim did not receive any prophylactic antibiotics, pregnancy prevention medication, or HIV prophylaxis medication because the victim "declined all meds." The report shows that Ms. Crues advised the victim to follow-up with her general physician or gynecologist in eight weeks and "Meharry GYN Clinic in 2-3 weeks for STD results." The report states that no general physician was consulted.

Based upon our de novo review, we agree with the State that the hearsay evidence was admissible as statements made for the purpose of medical diagnosis and treatment. Ms. Crues testified, and her report confirms, that she used the victim's statements to diagnose and treat her medically. Accordingly, we conclude that the Appellant is not entitled to relief.

## C. Prosecutor's Closing Arguments

The Appellant contends that he is entitled to a new trial based upon prosecutorial misconduct committed during the State's closing arguments. The State argues that the Appellant is not entitled to relief. We agree with the State.

The Appellant claims that the prosecutor "improperly vouched for the reliability of the State's witnesses, and for the rightness of the prosecution itself, with comments that effectively expressed her personal views as to the defendant's guilt and the credibility of witness testimony" by stating as follows during closing argument:

You heard Agent Johnson testify. I am quoting the TBI report which is somewhat wordy, <u>but I think it is very important</u>. "The probability of an unrelated individual having the same DNA profile as the contributor of the sperm fraction profile . . . exceeds the current world population."

(Emphasis added.) During the State's rebuttal closing argument, the second prosecutor stated as follows:

This is the State's opportunity to respond to . . . some of the allegations that have been made by the defense . . . and so I was writing down notes, but I apologize, but I am going to have to refer to them, but I want to make sure that I respond to all of the arguments that were made, <u>because this is a very important case to the State of Tennessee and certainly to [the victim] and her family.</u>

. . . .

There is nothing to suggest that there was anything wrong with this photographic line-up. <u>It is something that is done at police departments all of the time and it is a standard way of identifying somebody who is a suspect in a particular case and I ask that you will trust Sergeant Hammond and [the victim] to know that they did the very best that they could under these circumstances.</u>

. . . .

Under the law the Court has to instruct all of the lesser included offenses, okay? So they are there because they have to be, okay? And under the law they need to be, <u>if they are not there, and there is guilty conviction on this case then we could have to come back and try it again listing all of the lesser included offenses.</u>

(Emphasis added.)

At the conclusion of the prosecutor's rebuttal closing argument, defense counsel asked if "we may approach for one moment." The trial court announced that it was going

to take a short break and sent the jury out of the courtroom. During the break, defense counsel stated that he did not want to interrupt the State during closing arguments but that

> there were a number of times during her closing argument where she used personal language, this is important to the State, [the victim], I would submit that you should, and so I would ask the Court to just caution the jury that it should not decide this case to satisfy the victim or Mr. Batts or counsel for either side, but that they are required to decide it on the law and facts, so I think that for a solution.

The trial court advised defense counsel that, pursuant to the jury charge, it was going to instruct the jury as follows:

> [E]ach of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. Do not surrender your honest conviction, have no prejudice or sympathy or allow anything but the law and the evidence to have any influence upon your verdict.

In order to prevail on a claim of prosecutorial misconduct, the Appellant must demonstrate that the conduct committed by the prosecution was so inflammatory or improper that it affected the verdict to his detriment. Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965); State v. Gray, 960 S.W.2d 598, 609 (Tenn. Crim. App. 1997). In making this determination, this court is guided by five factors:

> 1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.
>
> 2. The curative measures undertaken by the court and the prosecution.
>
> 3. The intent of the prosecutor in making the improper statement.
>
> 4. The cumulative effect of the improper conduct and any other errors in the record.
>
> 5. The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); see also State v. Buck,

- 11 -

670 S.W.2d 600, 609 (Tenn. 1984). We note that "the Judge factors should only be applied to claims of improper prosecutorial argument," as in this case, not claims of unconstitutional prosecutorial comment. State v. Jackson, 444 S.W.3d 554, 591 n.50 (Tenn. 2014). "[T]he State bears the burden of proving unconstitutional prosecutorial comment or argument harmless beyond a reasonable doubt, whereas a defendant bears the burden of proving prejudice when prosecutorial argument is merely improper." Id.

Regarding prosecutorial misconduct during closing arguments, it is well-established that closing argument is an important tool for both parties during a trial; thus, counsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments. See State v. Carruthers, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

In Goltz, 111 S.W.3d at 6, this court outlined "five general areas of prosecutorial misconduct" that can occur during closing argument: (1) intentionally misleading or misstating the evidence; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt; (3) making statements calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge. "In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." State v. Pulliam, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996).

Initially, we note that counsel did not make contemporaneous objections to any of the prosecutors' comments. Moreover, when he did object, he proposed that the trial court remedy the prosecutors' errors with a jury instruction. The trial court stated that an appropriate instruction was already in the jury charge, and defense counsel made no further argument. A defendant's failure "to proffer contemporaneous objections to the challenged remarks" waives the issue on appeal. State v. Robinson, 146 S.W.3d 469, 518 (Tenn. 2004).

Nevertheless, we can review the issue for plain error. Tenn. R. App. P. 36(b); see State v. Knowles, 470 S.W.3d 416, 423 (Tenn. 2015). We may consider an issue to be plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial
> court; (b) a clear and unequivocal rule of law must have been

breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "'plain error' must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)).

Given the strength of the State's case, we can conclude that the prosecutors' first three comments do not rise to the level of plain error. As to the fourth comment regarding the jury's consideration of lesser-included offenses, the State acknowledges that the comment was "clearly improper" but argues that the Appellant is not entitled to relief because the comment "was not entirely inaccurate and a small part of a lengthy closing rebuttal argument."

We believe this court's opinion in State v. Joshua Schaeffer, No. E2005-00085-CCA-R3-CD, 2005 WL 3533304 (Tenn. Crim. App. at Knoxville, Dec. 27, 2005), perm. to appeal denied, (Tenn. May 1, 2006), is instructive. In Joshua Schaeffer, the prosecutor stated as follows:

> [T]he trial is over and the judge is going to be reading your instructions on what you are to consider after you've heard everything today. And the first thing he's going to ask that you consider is the charge of aggravated robbery, and I submit to you that that's the only charge you're going to have to consider because that's exactly what this defendant did. He submitted it. You've heard his confession.

No. E2005-00085-CCA-R3-CD, 2005 WL 3533304, at *7. The defendant objected and claimed on appeal that the argument encouraged the jury "to engage in jury nullification during her closing argument as it related to the jury's consideration of the lesser included offenses." Id. at *6. This court cautioned that "[c]ounsel should refrain from attempting to instruct the jury on the law" but concluded that "the statement did not, in our view, encourage the jury to disregard the law but was, instead, the prosecutor's assessment of the evidence, suggesting that the jury would not have to consider the lesser included offenses because of the overwhelming proof of the charged offense." Id. at 7.

Likewise, we caution prosecutors from attempting to instruct the jury on the law. Nevertheless, we agree with this court's assessment in Joshua Schaeffer and conclude that the prosecutor's statement in this case was a comment on the strength of the State's case. Furthermore, as this court noted in Joshua Schaeffer, the trial court gave the correct jury instructions regarding the consideration of lesser-included offenses, and we generally presume that the jury follows the instructions of the trial court. Id. Thus, the Appellant is not entitled to plain error relief.

## D. Due Process and Double Jeopardy

The Appellant contends that his convictions for rape and attempted rape violate due process because the two penetrations and one attempted penetration were part of a single, continuous sexual episode and asks that we utilize State v. Barney, 986 S.W.2d 545 (Tenn. 1999), in our analysis. He also contends that the three convictions violate double jeopardy. The State argues that the convictions do not violate due process or double jeopardy. We agree with the State.

In Barney, our supreme court set out a five-factor test for determining whether two or more sexual acts may be the subject of separate convictions. 986 S.W.2d at 548-49. The five factors are as follows:

> 1. temporal proximity-the greater the interval between the acts, the more likely the acts are separate;
>
> 2. spatial proximity-movement or re-positioning tends to suggest separate acts;
>
> 3. occurrence of an intervening event-an interruption tends to suggest separate acts;
>
> 4. sequence of the acts-serial penetration of different orifices as distinguished from repeated penetrations of the same orifice tends to suggest separate offenses; and
>
> 5. the defendant's intent as evidenced by conduct and statements.

Id. at 548-49. However, as this panel recently noted, "Although Barney has not yet been expressly overruled, this Court is uncertain as to its continued validity following State v. White, 362 S.W.3d 559, 578 (Tenn. 2012), and State v. Watkins, 362 S.W.3d. 551, 552 n.34 (Tenn. 2012)." State v. Stevie Michael Irwin, Jr., No. E2015-01448-CCA-R3-CD,

- 14 -

2016 WL 2853875, at *8 fn.3 (Tenn. Crim. App. at Knoxville, May 11, 2016).  In any event, we conclude that the Appellant's convictions do not violate due process concerns under Barney.

The victim testified that that the Appellant forced her to perform oral sex on him for a couple of minutes, that he performed oral sex on her for about one minute, and that he tried to penetrate her vaginally.  Although those intervals were not particularly lengthy, they were significantly more than mere seconds and of enough duration to be considered separate acts.  Moreover, all of the acts involved different body parts, different orifices, and obviously required repositioning of the Appellant and the victim.  Finally, the Appellant's telling the victim to "suck his [d***]" after he pushed her into her car and after he performed oral sex on her shows that he intended the acts to be separate.  Thus, we conclude the Appellant's separate convictions do not violate due process.

Next, we will address the Appellant's double jeopardy claim.  "Multiplicity concerns the division of conduct into discrete offenses, creating several offenses out of a single offense."  State v. Phillips, 924 S.W.2d 662, 665 (Tenn. 1996).  Multiple convictions for the same offense violate federal and state constitutional prohibitions against double jeopardy.  See U.S. Const. amend. V; Tenn. Const. art. I, § 10.  "Whether multiple convictions violate double jeopardy is a mixed question of law and fact that we review de novo with no presumption of correctness."  State v. Smith, 436 S.W.3d 751, 766 (Tenn. 2014).

The double jeopardy clauses of the United States and Tennessee Constitutions protect an accused from (1) a second prosecution following an acquittal; (2) a second prosecution following conviction; and (3) multiple punishments for the same offense.  See State v. Watkins, 362 S.W.3d 530, 541 (Tenn. 2012).  The instant case concerns the third category, protection against multiple punishments for the same offense in a single prosecution.  "Multiple punishment claims fall into one of two categories: (1) unit-of-prosecution claims; or (2) multiple description claims."  State v. Hogg, 448 S.W.3d 877, 885 (Tenn. 2014) (citing Watkins, 362 S.W.3d at 543).  This case involves unit-of-prosecution claims because the Appellant is asserting that multiple convictions under the same statute are for the same offense.  Id. at 886.  "'In determining the unit of prosecution, we first examine the statute in question to determine if the statutory unit of prosecution has been expressly identified.'  If the unit of prosecution is clear from the statute, there is no need to review the history of the statute and other legislative history."  Id. (quoting Smith, 436 S.W.3d at 768).  However, "any ambiguity in defining the unit of conduct for prosecution is resolved against the conclusion that the legislature intended to authorize multiple units of prosecution."  Watkins, 362 S.W.3d at 543 (citing Gore v. United States, 357 U.S. 386, 391-92 (1958)).

As charged in this case, rape is the "unlawful sexual penetration of a victim by the defendant or of the defendant by a victim" and "[f]orce or coercion is used to accomplish the act[.]" Tenn. Code Ann. § 39-13-503(a)(1). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7). In Hogg, our supreme court stated that "[t]he definition of 'sexual penetration' is broad and includes different examples of sexual activity, including 'any other intrusion, however slight.' The breadth of this definition convinces us that the 'unit of prosecution' is each act of 'unlawful sexual penetration.'" 448 S.W.3d at 886.

Here, the Appellant was convicted of two counts of rape and one count of attempted rape. Each count involved a different type of sexual penetration specifically included in the definition. Thus, we find no merit to the Appellant's multiplicity argument.

E. Sentencing

Finally, the Appellant contends that the trial court erred by imposing the maximum punishments in the range and consecutive sentencing. The State argues that the court properly sentenced the Appellant. We agree with the State.

At the Appellant's sentencing hearing, L.E.B.[1] testified that she was a nurse at Saint Thomas Midtown Hospital in Nashville. In the early morning hours of February 12, 2012, she was at work but took a break and walked to her car in the hospital's parking garage. While she had her car door open, a man approached and asked to borrow a cigarette lighter. L.A.B. gave him a lighter, and he returned it to her. He then unzipped his pants, pulled out his penis, and put his hand on her head. The man tried to force L.A.B.'s head down to his penis, but she resisted. She grabbed her cellular telephone and tried to call someone in the hospital, but the man took her telephone from her. He also took her personal iPhone and put them into his pocket. L.A.B. honked her car horn to summon help, and the man ran away. Later that day, the police returned her telephones to her. At some point, they also showed her a photograph array. L.A.B. said that she selected the Appellant's photograph, and she identified him at the victim's sentencing hearing as her attacker. She acknowledged that her case against the Appellant was pending and said that he deserved the maximum sentence in the instant case. On cross-examination, L.A.B. testified that the incident lasted less than ten minutes.

---

[1] It is the policy of this court to refer to victims of sexual offenses by their initials.

J.H. testified that in February 2012, she was working as a nursing assistant at Vanderbilt Medical Center. About 6:00 a.m. on February 12, J.H. took a break and rode the hospital elevator downstairs. When the doors opened, the Appellant was standing inside the hospital and in front of the elevator. J.H. said that she thought he was going to get on the elevator and that she smiled and nodded at him. She then got off the elevator and walked "outside into the garage." Her car was not parked there, so she walked to a corner of the hospital parking garage "where we take our breaks." When she turned around, she saw the Appellant standing in the garage. He was watching her but tried to hide behind a pole. J.H. said that she walked backed toward the hospital after her break and that she had no choice but to walk past the Appellant. She noticed that he was walking behind her and "speeding up." He grabbed her and put his hand over her mouth. She tried to scream, but he told her to stop. J.H. continued to walk toward the hospital, but the Appellant pulled her onto the ground. She said that she was on her back, kicking and screaming, and that someone walked outside and "spooked" the Appellant. The Appellant took J.H.'s cellular telephone and ran. She said that the attack changed her life and that she was "always looking over [her] shoulder."

The victim in this case testified that she was "devastated" and "a basket case" after the crimes. She said that she experienced numbness, anger, and blamed herself but that she refused to let the incident "eat [her] alive." She said that she had done "a ton of healing" and that therapy helped "a lot." The victim began volunteering at the Sexual Assault Center to help other victims, which allowed her to turn her attack into something positive. She said that she had recovered from the fear and numbness but that she still experienced "so much residual anger." The victim stated that L.A.B. and J.H. had "done a good job of really hitting home the seriousness of this" and that "there needs to be justice." She asked that the court "look at the facts and . . . do the right thing."

S.Y. testified that one day in August 2012, she returned home from work and saw a man on a bicycle. It was dark outside. The man came up behind S.Y. and put a gun in her face. She gave her cellular telephone to him, but he said, "I don't want that one." He pushed her behind her apartment and onto the ground, put his feet on her stomach, and took off his pants. She stated that he said something like "I want to . . . [f***] with you." S.Y. told him that her brother was in the car and that her brother was coming. The man saw someone and walked away. S.Y. went inside, told her mother, and telephoned the police. After the incident, she changed jobs so that she no longer worked at night. She also had trouble sleeping and pain in her leg caused by the man's pushing her onto the ground. She identified the Appellant in the courtroom as her attacker.

The State introduced the Appellant's presentence report into evidence. In the report, the then twenty-eight-year-old Appellant said that he had a "great" childhood. He

described his physical health as "good" but his mental health as "poor" because he had been told that he was schizophrenic and experienced hallucinations. The Appellant said that he took medication for about two months but that he stopped taking it because he was worried about receiving the wrong medication. The Appellant also stated that he began consuming alcohol when he was fourteen years old but that he stopped consuming it when he was twenty-one and that he smoked marijuana daily from the age of fourteen "until he came to jail." According to the report, the Appellant had one daughter but did not see her and did not pay child support. The report showed that the Appellant worked for a lawn service from May to December 2008 and UPS from December 2008 to April 2009 but that he had been unemployed since 2009. The Appellant said in the report that he had been selling drugs to make a living. The report showed that the Appellant had prior convictions for indecent exposure, driving without a license, and drug possession. The State also introduced into evidence a certified judgment of conviction showing that the Appellant pled guilty to selling less than one-half gram of cocaine in 2006 and three amended judgments showing that he violated probation in 2008, 2009, and 2010.

Sharon Batts, the Appellant's mother, testified for him that he was her first-born child and that she enjoyed him as a son. He was never a "trouble child," loved music, and sang in the church choir. He also played baseball for the YMCA. The Appellant went to the tenth grade at school. At that time, he was eighteen or nineteen years old. He took GED classes but never obtained his GED. The Appellant worked at Captain D's, Free-Way Car Lot, Kroger, and Precision Tuning. The Appellant's father was not involved in his life, and the Appellant never had a male role model in the home.

Ms. Batts testified that at some point, she started to think something was wrong with the Appellant "because he was doing things that [were] not him." The Appellant thought people on television were talking to him and that his mother was a gang member when she wore red clothing. He was also paranoid. Ms. Batts "called Mobile Crisis out" but was told nothing could be done "until he [did] something." She took him to Cornerstone Church to talk with a minister and to Centerstone, a mental health provider. She said that the Appellant had been in jail since February 12, 2012, and that he was segregated from the rest of the population because "he don't know how to deal with the population for some reason." Ms. Batts said that she had two nephews who had been patients at MTMHI and that she had been treated for depression. She stated that the Appellant was sick, that he was in denial, and that he deserved help. She said she did not raise the kind of person who would commit these offenses.

Dr. Pamela Auble testified that she was a psychologist and met with the Appellant in October 2012, June 2014, and March 2015. She diagnosed him with schizophrenia, and in her opinion, he was "severely mentally ill."

Dr. Auble testified that in September 2011, the Appellant was treated at the Mental Health Coop and found to be delusional and paranoid. He was diagnosed with bipolar affective disorder with psychotic features and treated with Depakote, a medication for people with psychosis and bipolar disorder. When Dr. Auble first met with the Appellant, he did not think anything was wrong with him. Dr. Auble interviewed his mother and sister. They said the Appellant changed in early 2011 and began making disturbing posts on Facebook. They also gave Dr. Auble letters the Appellant had written to them from jail. In the letters, the Appellant said he thought people in the jail were "trying to make him crazy," working together to try to destroy him, and speaking in codes. In April 2013, the Appellant saw another mental health professional, Dr. Brown, who "said that there was a question of delusional beliefs." In April and May 2013, the Appellant was evaluated at MTMHI. He was diagnosed with a delusional disorder and found to be incompetent due to his severe mental illness. He was admitted to MTMHI for two months and received injections of Haldol, a "major" antipsychotic medication. In July 2013, the Appellant was having paranoid delusions. By August 2013, he had improved with medication but was still having delusions about money and gangs.

Dr. Auble testified that Dr. Brown saw the Appellant again in April 2014 and thought he had irrational beliefs that interfered with his capacity to understand legal proceedings. In May 2014, MTMHI noted that the Appellant had paranoid beliefs and thought he was being "framed" by the government. When Dr. Auble interviewed him in June 2014, she found him to be delusional. The Appellant thought that he talked to celebrities on radio shows, that the news was often about him, and that President Obama would "bond him out." She said that she had met with the Appellant "a number" of times and that he had shown evidence of paranoia every time she had seen him. She stated that the Appellant could be manipulative and "use his mental illness from time-to-time." However, she thought evidence of his having an underlying mental illness was "overwhelming."

The trial court applied enhancement factors (1), that "[t]he defendant has a previous history of criminal behavior, in addition to that necessary to establish the appropriate range"; (7), that "[t]he offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement"; (8), that "[t]he defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community"; and (13), that at the time the felony was committed, the defendant was released on bail. Tenn. Code Ann. § 40-35-114(1), (7), (8), (13)(A). In mitigation, the court acknowledged that the Appellant "has some mental issues. That's pretty obvious." See Tenn. Code Ann. § 40-35-113(13). The court found that the enhancement factors "clearly overwhelm[ed]" the mitigating factors and sentenced the Appellant as a Range I, standard offender to the maximum punishment in the range for

each offense:  twelve years for rape, a Class B felony, in counts one and two; six years for attempted rape, a Class C felony, in count three; and six years for robbery, a Class C felony, in count four.  See Tenn. Code Ann. § 40-35-112(a)(2), (3).

The trial court stated that it appreciated the Appellant's mother's testimony but that the community needed to be protected from him "regardless of all these problems that he has had."  The court then stated that it was ordering consecutive sentencing based upon the Appellant's extensive record of criminal activity, which included his prior convictions and his daily use of marijuana since he was fourteen years old.  See Tenn. Code Ann. § 40-35-115(b)(2).  The court said there was "no question" that the Appellant should serve his effective thirty-six-year sentence in confinement because confinement was necessary to avoid depreciating the seriousness of the offenses.

Appellate review of the length, range, or manner of service of a sentence imposed by the trial court are to be reviewed under an abuse of discretion standard with a presumption of reasonableness.  State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing).  In sentencing a defendant, the trial court shall consider the following factors:  (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn.Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991).  The burden is on the Appellant to demonstrate the impropriety of his sentence.  See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of

mitigating and enhancement factors set out in § 40-35-113
and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

The Appellant contends that the trial court erred by imposing the maximum punishment in the range for each offense because a psychologist described him as extremely mentally ill and because the crimes were committed during a single episode that lasted less than ten minutes, involved no weapon, and did not result in injury to the victim. However, the trial court applied four enhancement factors, which the Appellant does not contest, and found that those factors "overwhelm[ed]" the single mitigating factor. The Appellant has failed to show that the court abused its discretion.

The Appellant also contends that the trial court erred by ordering consecutive sentencing because his effective thirty-six-year sentence "is greater than that deserved for the offenses committed" and "is not the least severe measure necessary to achieve the purposes for which the sentence is imposed." See Tenn. Code Ann. § 40-35-103(2), (4). We disagree. The trial court ordered consecutive sentencing based upon the Appellant's extensive criminal history, and he makes no argument regarding that finding. Accordingly, we conclude that the trial court did not abuse its discretion by ordering consecutive sentencing.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE

- 21 -